UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------
TARA K. DENNIS-PENDARVIS,

                 Plaintiff,

       v.

COMMISSIONER OF SOCIAL SECURITY,

                 Defendant.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
20-CV-05481 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiff Tara K. Dennis-Pendarvis commenced the above-captioned action on November 11, 2020, against the Commissioner of Social Security (the "Commissioner"). (Compl., Docket Entry No. 1.) Plaintiff seeks review of a final decision of the Commissioner denying Plaintiff's claim for Social Security disability insurance benefits under the Social Security Act (the "SSA"), pursuant to 42 U.S.C. § 405(g). (Compl. ¶ 1.) Plaintiff moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that Administrative Law Judge Robert R. Schriver (the "ALJ") failed to properly develop the record and that his residual functional capacity ("RFC") determination was unsupported by substantial evidence. (Pl.'s Mot. for J. on the Pleadings ("Pl.'s Mot."), Docket Entry No. 13; Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem."), annexed to Pl.'s Mot., Docket Entry No. 13-1; Pl.'s Reply to Resp. to Mot. ("Pl.'s Reply"), Docket Entry No. 17.) The Commissioner cross-moves for judgment on the pleadings, arguing that the ALJ properly considered the licensed clinical social worker's opinions and adequately developed the record. (Comm'r Cross-Mot. for J. on the Pleadings ("Comm'r Mot."), Docket Entry No. 16; Comm'r Mem. in Supp. of Comm'r Mot. ("Comm'r Mem."), annexed to Comm'r Mot. Docket Entry No. 16-1.)

For the reasons set forth below, the Court denies the Commissioner's cross motion for judgment on the pleadings, grants Plaintiff's motion for judgment on the pleadings, and orders the case be remanded for further administrative action.

## I. Background

Plaintiff is a fifty-one-year-old woman with a Bachelor of Science in Social Work. (Certified Admin R. ("R.") 34, Docket Entry No. 11.)  While working as a Parole Officer, Plaintiff injured her right hand.  (R. 35, 37–38.)  Plaintiff filed a claim for disability benefits due to right hand nerve damage, diabetes, and panic attacks on July 31, 2018, with an alleged disability onset date of March 9, 2017.  (R. 10.)  Her claim was denied on December 10, 2018. (R. 10.)  Plaintiff requested a hearing before an ALJ, (R. 79–80), which was held on October 22, 2019.  (R. 28–57.)  At the hearing, Plaintiff was represented by counsel and amended her application to a closed period of disability from March 9, 2017 to August 16, 2019.  (R. 30–31.) By decision dated November 25, 2019, the ALJ denied Plaintiff's claim, concluding that Plaintiff's date last insured was December 31, 2017, and that Plaintiff was "not disabled under sections 216(i) and 223(d) of the Social Security Act through" her DLI.  (R. 7–20.)  Plaintiff requested review by the Appeals Counsel, (R. 135–37), which denied her request for review on September 9, 2020, thus making the Commissioner's decision final, (R. 1–3).  Plaintiff filed a timely appeal with the Court.  (Compl.)

### a.  Hearing before the ALJ

Plaintiff appeared in-person at an October 22, 2019 hearing before the ALJ with counsel. (R. 30.)  During the hearing, the ALJ heard testimony from Plaintiff and a vocational expert, Marian R. Marracco.  (R. 28–57.)

### i.  Plaintiff's testimony

Plaintiff was a parole officer for approximately two and a half years before she stopped working.  (R. 35.)  Prior to that, she worked with New York State Children and Family Services for about four months, inspecting group facilities, (R. 35–36); as a child protective specialist at the Administration for Children Services ("ACS") for New York City, making home visits throughout Queens, for approximately eight and a half years, (R. 36–37); and as a family social worker at Episcopal Family Services, (R. 37).

Plaintiff suffered an injury in July of 2016 while working as a parole officer and monitoring a parolee who stated that he was having seizures.  (R. 37–38.)  In the "process of preventing [the parolee] from hurting himself," the parolee pinned Plaintiff's right hand between his head and the kitchen table.  (R. 38.)  Plaintiff is right-handed.  (R. 38.)  After the incident, Plaintiff was referred to an orthopedist and returned to work in November of 2016 following occupational therapy.  (R. 38.)  Plaintiff initially did not want surgery because it "would incapacitate [her]," but ultimately requested surgery because it was difficult for her to keep her firearm on her right side as required for her job.  (R. 38–39.)  Her request for surgery was not approved until March of 2017.  (R. 39.)  Plaintiff continued working up until the week before surgery, when she had a panic attack on the job.  (R. 39.)  About a year and a half later, Plaintiff had another surgery on her hand due to nerve pain.  (R. 39.)  After the surgery, "the pain lessened," and Plaintiff had occupational therapy due to "issues with small motor movements."

(R. 39.)  Plaintiff also had injections in her hand prior to surgery.  (R. 39.)  Plaintiff testified that she "kept dropping things" and had difficulty lifting and carrying things.  (R. 39–40.)

In April of 2018, Plaintiff had surgery on her knee.  (R. 40.)  Her knee improved after surgery, but she experiences issues with her other knee as well.  (R. 40–41.)  She also experienced problems with her elbows and shoulders at the time.  (R. 40.)  An orthopedist recommended that Plaintiff have shoulder surgery, but she did not want the surgery because it "would really incapacitate [her]."  (R. 40.)  Plaintiff also had back problems and had a series of epidural steroid injections in her back for nerve pain in her back and hips.  (R. 40–41.)  The last time Plaintiff saw an orthopedist was July 16, 2019, when she saw Dr. Mitgang and he recommended physical therapy.  (R. 41.)  Since then, Plaintiff's hand and arm are "about the same."  (R. 41.)  From March 2017, when Plaintiff stopped working, until shortly after her orthopedist appointment in July of 2019, she could not have gone back to any of her jobs on a full-time basis because they all require "being able to use [her] hand fully."  (R. 41–42.)  In her role as a parole officer, she would need to be able to "grab things" like her gun, pepper spray, and baton.  (R. 42.)  Plaintiff testified that as a parole officer, "[t]hey don't allow desk work" and "[y]ou can't just sit at a desk."  (R. 42.)  She also testified that she would not have been able to do a job where she had to use her hands "eight hours a day, five days a week."  (R. 42–43.)

Plaintiff's diabetes is stable and under control.  (R. 43.)  She had never had a panic attack until the one she had during her last week of work, but since then she has continued to have panic attacks.  (R. 43.)  Because the first panic attack was "very debilitating," she began working

with Ms. Goldstein so that she would not have future panic attacks.  (R. 43.)  Plaintiff is not on any medication for her panic attacks.  (R. 43–44.)

From March of 2017 to August of 2019, Plaintiff did not engage in any "outside activities outside the home."  (R. 43–44.)  On a typical day, she would wake her children up and walk her daughter to the corner for school.  (R. 44.)  She would then "do some of [her] exercises for [her] hand and basically just rest."  (R. 44.)  Plaintiff was not doing any of the household chores at that time.  (R. 44.)  She has looked into going back to school to get a graduate degree in teaching to teach elementary school students because teachers "take breaks" and don't have to "constantly be writing, all the time."  (R. 44–45.)

Following her injury, Plaintiff developed a "habit of dropping things," like cups or food from the fridge.  (R. 45.)  She did not lift or carry heavy things because "it bothered [her]."  (R. 45.)  During the relevant period, Plaintiff was not able to sit or stand without changing position for more than ten minutes.  (R. 46.)  She was unable to walk farther than "[to] the corner."  (R. 46.)

### ii.   Marian R. Marracco, vocational expert

Vocational expert Marian R. Marracco (the "VE") testified at the hearing.  (R. 48.)  The VE said that Plaintiff had "essentially two jobs in the relevant period": caseworker, which has a specific vocational preparation ("SVP") of seven and was performed at a light exertional level; and parole officer, which also has a SVP of seven and was performed at a light exertional level. (R. 48–49.)  The VE considered "caseworker" to cover both Plaintiff's position with the New York Child and Family Services and her position with ACS.  (R. 49.)

The ALJ asked the VE if a hypothetical individual ("Hypothetical Individual 1") of Plaintiff's same age and education level, who was "limited to work at the light exertional level,"

could only occasionally "climb, crouch, crawl, kneel, stoop, or balance" or "reach overhead with either arm," and "could frequently use their right hand for grasping, handling, and fingering" could perform any of Plaintiff's past jobs.  (R. 49–50.)  The VE responded that Hypothetical Individual 1 could perform both of these jobs.  (R. 50.)  The ALJ asked if an individual with the same capacities but who could only occasionally grasp, handle, or finger with the right hand ("Hypothetical Individual 2") could perform these jobs.  (R. 50.)  The VE responded that Hypothetical Individual 2 could perform these jobs as well.  (R. 50.)  The ALJ asked whether an individual who could only use their right hand occasionally and could only work at the sedentary exertional level ("Hypothetical Individual 3") could perform Plaintiff's past jobs.  (R. 50.)  The VE said that both of Plaintiff's past jobs would exceed Hypothetical 3's exertional limitations. (R. 50–51.)  She added that although overhead reaching is not addressed in the Dictionary of Occupational Titles ("DOT"), neither of Plaintiff's previous jobs "would require anything more than occasional overhead reaching with either arm."  (R. 50–51.)

The ALJ then asked if Hypothetical Individual 3 would be able to "perform other work in the national economy."  (R. 51.)  The VE said that Hypothetical Individual 3 would be able to work as a "clerk for customer service," an "information clerk or greeter," and a "security system monitor," although this position was "controversial."  (R. 51.)  The ALJ asked what the VE's opinion about overhead reaching was based on, since it was not specifically addressed in the DOT.  (R. 51–52.)  The VE replied that it was based on her "professional credentials" and "in [her] opinion."  (R. 52.)

Plaintiff's counsel asked the VE which of the jobs she had mentioned would be available for an individual "who only had less than occasional use of the dominant right upper extremity." (R. 52.)  The VE replied that that the only job that would remain would be video surveillance

monitor.  (R. 52.)  Plaintiff's counsel then asked what the VE had meant when she said that surveillance monitor was a "controversial" position.  (R. 52.)  The VE replied that "people say that the job doesn't exist anymore as it is described in the DOT," which is "partly true."  (R. 53.)  The job is described as occurring in a bus station, but its "current iteration is actually more in, maybe casinos, department stores, like retail stores."  (R. 53.)  Plaintiff's counsel asked if surveillance monitors "may have some other security duties, as well."  (R. 53.)  The VE replied that "it could be" but that "generally it is just, literally watching the screens for . . . something like shoplifting," and then "using a phone or some sort of two-way device to alert someone else that the activity is in fact going on."  (R. 53.)  She said that the last time she had seen the job being performed was four years ago in New Jersey, when she saw one such job in a department store and another in a casino.  (R. 54.)  Plaintiff's counsel said that he would submit "an article concerning surveillance system monitors" which states that "in the current labor market" the job is combined "with the responsibilities of other jobs, including loss prevention agent and security officer."  (R. 54–55.)  The article concludes that "there is no evidence that the surveillance system monitor occupation exists in the U.S. economy as sedentary and unskilled and as classified in the last edition of the" DOT.  (R. 55.)  Plaintiff's counsel also claimed that Plaintiff "certainly had less than occasional use of her dominant right upper extremity throughout this period," and that because the surveillance monitor job does not exist as described in the DOT, "there is no alternative work that [Plaintiff] could have performed during that period."  (R. 56.)

  **b.** **Medical evidence**

    **i.** **Paula Goldstein, LCSW**

  Paula Goldstein, LCSW, submitted an undated statement about Plaintiff.  (R. 201.)  She stated that Plaintiff's initial reason for coming to her office was "panic attacks from work related

issues due to a very demanding supervisor." (R. 201.)  The stress "caused elevated blood
pressure." (R. 201.)  Plaintiff has a "history of migraines and" diabetes, and her job stress causes
her diabetes "to go up and down." (R. 201.)  Ms. Goldstein wrote that Plaintiff had come to her
"a month after hand surgery" due to an incident when a parolee "allegedly had a seizure" and
injured Plaintiff. (R. 201.)  She stated that "[a]t this time [Plaintiff] cannot handle a gun." (R.
201.)  Plaintiff had had surgery on her right hand and wrist and was "awaiting approval from
workers comp" to have a second surgery. (R. 201.)  Plaintiff also had a "record of surgery
recently due to torn meniscus . . . and arthritis in her knees." (R. 201.)  She also experienced
"lower back pain in both hips." (R. 201.)  It was very difficult for Plaintiff to "sit too long" due
to pain in her hand, wrist, knees, and hips. (R. 201.)

 Ms. Goldstein also submitted a medical assessment of Plaintiff dated October 20, 2019.
(R. 430–32.)  The assessment stated that Plaintiff had a "fair" ability to follow work rules, relate
to coworkers, deal with the public, use judgment, function independently, and maintain
concentration. (R. 430.)  However, her ability to interact with supervisors and deal with work
stresses was "poor or none." (R. 430.)  The assessment stated that job stress causes Plaintiff's
"diabetes numbers to go up and becomes a dangerous situation and affects her concentration and
attention." (R. 430.)  Plaintiff also has hypertension, which is affected by stress, which in turn
causes migraines, "so stress can be dangerous to her" and "affects her judgment." (R. 430.)
Plaintiff has "trouble dealing with other workers including supervisors" and also "suffers from
panic attacks." (R. 430.)

 The assessment states that Plaintiff finds it "very difficult to drive a long way . . . to work
due to pain in her hand, wrist, knees + hips." (R. 431.)  Ms. Goldstein stated that it was her
"professional opinion that [Plaintiff] is unable to work at this time." (R. 431.)  She rated

Plaintiff's ability to understand, remember, and carry out complex or detailed job instructions as fair, and her ability to understand, remember, and carry out simple job instructions as good. (R. 432.) She described Plaintiff's limitations as her diabetes and hypertension causing confusion in stressful situations. (R. 432.) Ms. Goldstein rated Plaintiff's ability to maintain personal appearance and behave in an emotionally stable manner as good, and her ability to demonstrate reliability as fair. (R. 432.) Finally, Ms. Goldstein stated that Plaintiff is able to manage benefits in her own best interest. (R. 432.)[1]

### c.   Non-medical evidence

#### i.   Disability Determination Explanation

The record includes a Disability Determination Explanation completed by G. Feldman and P. Kennedy-Walsh and dated December 7, 2018. (R. 59–64.) The explanation states that Plaintiff has a medically determinable impairment, namely "Dysfunction – Major Joints." (R. 62.) However, it finds that there is "insufficient evidence to evaluate" Plaintiff's claim under listing 1.02, "Dysfunction – Major Joints." (R. 63.) It also states that there is insufficient evidence to substantiate the presence of anxiety and obsessive-compulsive disorders. (R. 62.) It concludes that Plaintiff is not disabled. (R. 64.)

#### ii.   Function report

The record includes a function report completed by Plaintiff and dated September 24, 2018. (R. 157–66.) In the report, Plaintiff states that she lives with her family. (R. 157.) In the morning, she wakes up, wakes up her kids, and takes them to school. (R. 157.) She does her rehab exercises and rests during the day. (R. 157.) When her kids come home from school, she

---

[1] Although there is other medical evidence in the record, because the Court decides this motion on the basis of Plaintiff's mental impairment, the Court does not include other evidence in this decision.

supervises their homework, makes dinner, spends time with her kids, and puts them to bed.  (R. 157.)  She reads or watches TV before going to bed.  (R. 157.)  If she has a scheduled medical appointment, her husband takes her.  (R. 157.)

Plaintiff's son has taken over responsibilities for the dog and cat and Plaintiff's children and husband "have had to take over [and] participate more due to [Plaintiff's] medical issues." (R. 158.)  Before Plaintiff's medical issues, she "was able to care for [herself and] kids [without] much help from them or [her] husband."  (R. 158.)  Now, her kids "must do more for themselves" and her husband "must work more due to [Plaintiff] not working."  (R. 158.) Plaintiff's nerve pain is worse at night and makes it difficult "to get to sleep, stay asleep and have a restful sleep," and she sleeps at most five hours a night.  (R. 158.)  Plaintiff has "difficulty putting on pants due to hip [and] back pain," and her injury makes "washing up, [and] washing hair difficult due to pain" and mobility issues.  (R. 158.)  "Some hand movements [are] very difficult."  (R. 158.)  She also uses hair styles that do not require frequent brushing or combing as "brushing, combing is difficult."  (R. 158.)  Plaintiff has had no difficulty feeding herself, remembering to take care of her personal needs, or remembering to take medicine.  (R. 158–59.)

Plaintiff usually eats once a day and makes "something simple[,] salad [and] meat."  (R. 159.)  The kids heat up their meals in the microwave or Plaintiff makes soup.  (R. 159.)  She along with her husband and kids prepare meals "daily."  (R. 159.)  Since her medical issues began, Plaintiff make "meals more infrequently" and the kids have started making meals for themselves.  (R. 159.)

Plaintiff is able to do laundry and load the dishwasher.  (R. 159.)  She needs her husband to carry laundry to the basement.  (R. 160.)  Due to her hand, knee, hip, and back pain, Plaintiff

does not do yard work.  (R. 160.)  Housework takes a very long time and requires her husband's

help, such that Plaintiff can "only do it when he is not working."  (R. 160.)

Plaintiff only goes outside once or twice a day, either driving or riding in a car.  (R. 160.)

She can go outside alone and had a driver's license.  (R. 160.)  However, her husband has the car

"99% of the time" and will usually drive her where she needs to go.  (R. 160.)  Plaintiff shops for

groceries and "stuff for family" whenever necessary.  (R. 160.)

Plaintiff is able to pay bills, count change, and handle a savings account, and her ability

to handle money has not changed since her medical issues began.  (R. 161.)  Her medical issues

have not affected her interest in reading.  (R. 161.)  Plaintiff does not do social activities or go to

social events on a regular basis.  (R. 161.)  She has no problem getting along with others, but

reported that she does not interact with people as much as she did before her medical issues

because she does not "go out or talk on the phone."  (R. 162.)

Plaintiff has difficulty lifting due to hand, back, and hip pain, and requires help lifting

things.  (R. 162.)  Hip and back pain also make it difficult to stand up for relatively long periods.

(R. 162.)  She also experiences hip and knee pain when walking long distances.  (R. 162.)

Plaintiff can only sit on a cushion and frequently gets up due to back and hip pain.  (R. 162.)  She

tries not to take the stairs often due to knee, back, and hip issues.  (R. 162.)  Because her knee is

tender from surgery and she sometimes gets fluid on her knee, Plaintiff does not kneel.  (R. 162.)

She also finds squatting difficult due to her knee injury.  (R. 162.)  Reaching can be difficult

"due to tears in both shoulders" and arthritis.  (R. 162.)  Using her right hand is also difficult due

to injury, and she frequently drops things due to mobility and flexibility issues accompanied by

nerve pain.  (R. 162.)  She has no issues seeing, hearing, or talking.  (R. 163.)  She does not

know how long she can walk without having to stop and rest because she tries "not to walk

often." (R. 163.)  She guesses that she would have to rest for fifteen minutes before she could continue walking. (R. 163.)  Plaintiff does not have problems paying attention, but sometimes cannot finish what she started because she takes breaks due to pain. (R. 163.)  Plaintiff can follow spoken and written instructions, does not have difficulty getting along with authority figures, and has never lost a job due to problems getting along with people. (R. 164.)  When her work stress became too much, she had a panic attack, and has not worked since the panic attack. (R. 164.)  Plaintiff does not have trouble remembering things. (R. 164.)

After two months of increasing job stress, Plaintiff had a panic attack and was taken to the hospital. (R. 164.)  She believes the panic attacks are stress related and occur when she is under mental and emotional duress. (R. 164.)  During a panic attack, she is unable to breathe or talk, experiences tunnel vision, has difficulty walking, and her blood pressure goes up. (R. 164.)  She tries to calm herself during panic attacks by talking to herself and distracting herself. (R. 165.)  Due to increased stress "from being out of work and dealing [with] workers comp," she experiences a panic attack at least once a month. (R. 165.)  However, she works hard to calm herself and talks to her therapist. (R. 165.)  The panic attacks do not last long as long as she gets away from or distracts herself from the trigger. (R. 165.)  Plaintiff can travel by herself, but during an attack she is not able to do things like shop or drive. (R. 165.)  Once the symptoms lessen, she needs quiet time and a place to be alone for about fifteen to thirty minutes in order to "mentally regroup [and] calm down." (R. 165.)  Plaintiff sees Ms. Goldstein for this condition

but does not take medication.  (R. 165.)  The condition caused her to have difficulty socializing

with "work related people, i.e. supervisors."  (R. 165.)

### d.    The ALJ's decision

In a decision dated November 25, 2019, the ALJ found that Plaintiff was not disabled.

(R. 7–23.)  The ALJ conducted the five-step sequential analysis as required by the SSA.[2]  He

first found that Plaintiff had not worked from March 9, 2017, through her date last insured,

December 31, 2017.  (R. 12–13.)  Second, the ALJ found that Plaintiff had suffered from the

following severe impairments through the date last insured: right thumb arthritis, de Quervain's

tenosynovitis of the right wrist, degenerative joint disease of the right knee, osteoarthritis and

internal derangement of the left knee, internal derangement of the right shoulder, degenerative

disc disease of the lumbar spine, lumbar radiculopathy, and obesity.  (R. 13.)  The ALJ also

stated:

> In addition, diabetes, migraine headaches and anxiety attacks were
> impairments mentioned in statements by a social worker, Paula
> Goldstein. . . . They were not established in the treatment notes in
> the medical evidence, and have not required treatment or
> medication.  As a social worker, Ms. Goldstein is not qualified to
> make such an acceptable diagnosis under the Regulations.    I

---

[2]  The five-step sequential process outlined by the SSA considers:
>  (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or
> combination of impairments; (3) whether the impairment meets or
> equals the severity of the specified impairments in the Listing of
> Impairments; (4) based on a 'residual functional capacity'
> assessment, whether the claimant can perform any of his or her past
> relevant work despite the impairment; and (5) whether there are
> significant numbers of jobs in the national economy that the
> claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*Demars v. Comm'r of Soc. Sec.*, 841 F. App'x 258, 260–61 (2d Cir. 2021) (quoting *Estrella v.*
*Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019)).

therefore find that these impairments are not medically diagnosed
impairments.

(R. 13.)

Third, the ALJ found that Plaintiff "did not have an impairment or combination of
impairments that met or medically equaled the severity of one of the listed impairments in 20
[C.F.R.] Part 404, Subpart P, Appendix 1." (R. 13.) Plaintiff "was evaluated under the criteria
for listings 1.02 for joint disorders and 1.04 for back impairments," but did not "meet the
severity requirements for the listings." (R. 13.) Nor did the severity of Plaintiff's obesity
"contribute to marked functional limitations in other related medical conditions." (R. 13–14.)

Fourth, the ALJ found that Plaintiff had the RFC to perform light work as defined in 20
C.F.R. 404.1567(b), "except that she could only occasionally climb, crouch, crawl, kneel, stoop,
balance, or reach overhead with either arm; and could frequently use her right hand for grasping,
handling, and fingering." (R. 14.) In reaching this conclusion, the ALJ reviewed the medical
evidence in the record, (R. 14–17), as well as the Disability Determination Explanation. (R. 17.)
The ALJ noted Ms. Goldstein's statements, but stated that "the problems discussed by Ms.
Goldstein do not rise to the level of a psychiatric impairment" because it was "not a diagnosis
provided by an appropriate medical source under the regulations," (R. 16), and further stated
that:

> [Ms. Goldstein's opinion] was not [a] persuasive opinion, since a
> diagnosis provided by Ms. Goldstein would not establish a
> psychiatric condition under the Regulations, and the opinions
> expressed were not consistent with what was seen in the medical
> record, since [Plaintiff] has not received any manner of psychiatric
> treatment. Considering all of that, the findings presented by Ms.
> Goldstein, of good and fair capabilities in almost all categories,

14

would not be consistent with an individual with severe mental
limitations.

(R. 17.)

The ALJ then followed a two-step process in which he first "determined whether there is
an underlying medically determinable physical or mental impairment(s) . . . that could reasonably
be expected to produce [Plaintiff's] pain or other symptoms," and then evaluated the intensity,
persistence, and limiting effects of Plaintiff's symptoms "to determine the extent to which they
limit [Plaintiff's] work-related activities."  (R. 18.)  The ALJ found that Plaintiff's "medically
determinable impairments could reasonably be expected to cause the alleged symptoms."  (R. 18.)
However, he also found that Plaintiff's "statements concerning the intensity, persistence and
limiting effects of [those] symptoms are not entirely consistent with the medical evidence and
other evidence in the record."  (R. 18.)  He stated that the medical evidence had not identified an
impairment that would explain Plaintiff's alleged degree of pain and limitation, noting "the lack
of ongoing treatment, the medical treatment for pain, and the indications . . . that most disorders
were treated and resolved prior to" the date last insured.  (R. 18.)  Plaintiff had right hand surgery
in May 2017 and another surgery in October of 2018; the ALJ stated that "[p]ost-surgical
treatment records suggest that these conditions effectively resolved with surgery, with only
minimal limitations seen on subsequent physical examinations."  (R. 18.)  Plaintiff was also
evaluated for intermittent back pain.  (R. 18.)  While Plaintiff was obese throughout the period,
"there were no related restrictions seen in the physical examinations."  (R. 18.)  The ALJ
incorporated limitations from Plaintiff's shoulder issues into his determination of her RFC but
noted that "the most significant shoulder problems were not identified until August 2018."  (R.
19.)  The treatment record also indicated "a short period" of alleged hip problems.  (R. 19.)
Plaintiff's pain complaints were "frequently described as a level 5 out of 10," but did not require

15

"extensive pain management."  (R. 19.)  Plaintiff was also able to ambulate without assistance.

(R. 19.)  The ALJ concluded that Plaintiff had "made significant improvements in her functional

capacity" and that prior to Plaintiff's DLI, she "retained sufficient functional capacity to allow her

to perform a wide range of sedentary and light exertional activities."  (R. 19.)

At step five, the ALJ determined, consistent with the testimony of the VE, that Plaintiff

was capable of performing past relevant work as a parole officer and a case worker.  (R. 19.)  He

concluded that Plaintiff was not under a disability, as defined in the Social Security Act, any time

from March 9, 2017 to the date last insured.  (R. 19–20.)

## II.  Discussion

### a.  Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine

whether the correct legal standards were applied and whether substantial evidence supports the

decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*,

416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per

curiam).  "Substantial evidence means more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  *Sczepanski v.

Saul*, 946 F.3d 152, 157 (2d Cir. 2020) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.

2009)); *see also Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (per curiam) (same);

*McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same).  Once an ALJ finds facts, the court

"can reject those facts only if a reasonable factfinder would have to conclude otherwise."

*Talyosef v. Saul*, 848 F. App'x 47, 48 (2d Cir. 2021) (quoting *Brault v. Soc. Sec. Admin.*, 683

F.3d 443, 448 (2d Cir. 2012)).  In deciding whether substantial evidence exists, the court

"defer[s] to the Commissioner's resolution of conflicting evidence."  *Smith v. Berryhill*, 740 F.

App'x 721, 726 (2d Cir. 2018) (quoting *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir.

2012)).  If, however, the Commissioner's decision is not supported by substantial evidence or is

based on legal error, a court may set aside the Commissioner's decision.  *See Ewen v. Saul*, No.

19-CV-9394, 2021 WL 1143288, at *11 (S.D.N.Y. Mar. 23, 2021) (citing *Moran*, 569 F.3d at

112); *see also Prince v. Astrue*, 514 F. App'x 18, 19–20 (2d Cir. 2013) (citing *Burgess v. Astrue*,

537 F.3d 117, 128 (2d Cir. 2008)).  "In making such determinations, courts should be mindful

that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is

inclusion rather than exclusion.'"  *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8

(S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723

(2d Cir. 1983)).

> **b.  The ALJ failed to develop the record**

Plaintiff argues that if the ALJ was dissatisfied with Ms. Goldstein's findings, "he had an

affirmative duty to further develop the record with regard to Plaintiff's limitations and their

effect on her ability to work before finding Ms. Goldstein's opinion not persuasive."  (Pl.'s

Mem. 18–19.)  Further, Plaintiff argues that the ALJ erred by failing to question Plaintiff about

the impact of her mental impairments on her ability to interact with others and function in the

workplace.  (*Id.* at 19, 21.)

In response, the Commissioner argues that no further development of the record was

necessary because "no further development is required where the evidence of record is adequate

for the ALJ to make a disability determination."  (Comm'r Mem. at 15–16.)  The Commissioner

argues that the ALJ "reasonably found that the evidence did not establish a medically

determinable mental impairment," noting Plaintiff's concessions that she did not see a

psychiatrist, take medications for a mental condition, or have difficulties getting along with

others, paying attention, following instructions, or remembering things.  (*Id.* at 17.)

A district court must ensure that the ALJ has adequately developed the record in accordance with 20 C.F.R. § 404.1520(a)(3), which requires an ALJ to consider all evidence in the case record when making a determination or decision on a claimant's disability.  *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009) ("[I]t is the rule in our circuit that the [social security] ALJ, unlike a judge in a trial, must [on behalf of all claimants] . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." (alterations in original) (quoting *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir. 1999))).  Although a "claimant has the general burden of proving that he or she has a disability within the meaning of the Act," *Sczepanski*, 946 F.3d at 158 (citing *McIntyre*, 758 F.3d at 149), "[b]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record," *Burgess*, 537 F.3d at 128 (alteration in original) (quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)); *see also Yuckus v. Comm'r of Soc. Sec.*, 829 F. App'x 553, 558 (2d Cir. 2020) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel[.]" (alterations in original) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 n.1 (2d Cir. 2013) ("Unlike a judge at trial, the ALJ has a duty to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" (quoting *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011))).  This duty is present "[e]ven when a claimant is represented by counsel."  *Moran*, 569 F.3d at 112 (collecting cases); *see also Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) ("[T]he ALJ's general duty to develop the administrative record applies even where the applicant is represented by

18

counsel . . . ." (citing *Rosa*, 168 F.3d at 79)); *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 279

(N.D.N.Y. 2009) ("[A]n ALJ has an affirmative duty to develop the record, even if the claimant

is represented by counsel, if the medical record is ambiguous or incomplete." (first citing *Tejada*,

167 F.3d at 774; and then citing *Rosa*, 168 F.3d at 79)).  In addition, the ALJ must attempt to fill

in gaps in the record.  *See Blash v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 642, 645 (2d Cir.

2020) ("When there is an obvious or 'clear gap[]' in the record, the ALJ is required to seek out

missing medical records, even when a party is represented by counsel." (alteration in original)

(quoting *Rosa*, 168 F.3d at 79)); *Rosa*, 168 F.3d at 79 & n.5 (explaining that the ALJ must

attempt to fill "clear gaps" in the record, but "where there are no obvious gaps . . . and where the

ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek

additional information (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996))).

     The duty to develop obligates the Commissioner "to develop a complete medical record,"

*Blash*, 813 F. App'x at 645 (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); and then

citing 20 C.F.R. § 404.1512(b)), which is "detailed enough to allow the ALJ to determine the

claimant's RFC," *Sigmen v. Colvin*, No. 13-CV-268, 2015 WL 251768, at *11 (E.D.N.Y. Jan.

20, 2015) (citing *Casino-Ortiz v. Astrue*, No. 06-CV-155, 2007 WL 2745704, at *7 (S.D.N.Y.

Sept. 21, 2007), *report and recommendation adopted*, 2008 WL 461375 (Feb. 20, 2008)).

Pursuant to the SSA regulations, the Commissioner is obligated to "make every reasonable effort

to help [the claimant] get medical evidence from [his] own medical sources and entities that

maintain [his] medical sources' evidence when [the claimant] give[s] . . . permission to request

the reports."  20 C.F.R. § 404.1512(b)(1); *see also Perez*, 77 F.3d at 47.  The Commissioner's

duty to make such efforts includes the duty to seek, as part of such medical evidence and reports,

a medical source statement or functional assessment detailing the claimant's limitations.  *See*

*Robins v. Astrue*, No. 10-CV-3281, 2011 WL 2446371, at *3 (E.D.N.Y. June 15, 2011) ("[SSR]

96-5p confirms that the Commissioner interprets those regulations to mean that '[a]djudicators

are generally required to request that acceptable medical sources provide these statements with

their medical reports.'" (alteration in original) (quoting SSR 96-5p, 1996 WL 374183 (July 2,

1996))).  Failing to adequately develop the record is an independent ground for vacating the

ALJ's decision and remanding for further findings.  *See Rosa*, 168 F.3d at 83 (finding remand

"particularly appropriate" where the ALJ failed to obtain adequate information from treating

physicians and potentially relevant information from other doctors); *see also Morris v. Berryhill*,

721 F. App'x 25, 27 (2d Cir. 2018) ("Failure to develop the record warrants remand." (first citing

*Rosa*, 168 F.3d at 79–80; and then citing *Moran*, 569 F.3d at 113–15)); *Green v. Astrue*, No. 08-

CV-8435, 2012 WL 1414294, at *14 (S.D.N.Y. Apr. 24, 2012) ("[F]ailure to develop the record

adequately is an independent ground for vacating the ALJ's decision and remanding the case."

(citing *Moran*, 569 F.3d at 114–15)), *report and recommendation adopted*, 2012 WL 3069570

(July 26, 2012).  Nevertheless, even where an ALJ fails to develop the opinion of a treating

physician, remand may not be required "where . . . the record contains sufficient evidence from

which an ALJ can assess the petitioner's [RFC]."  *Tankisi*, 521 F. App'x at 34.

 The Administrative Record contains one undated page of handwritten notes from Ms.

Goldstein that indicates Plaintiff began seeing the social worker in January of 2017 but does not

indicate how long or how often Ms. Goldstein treated Plaintiff.  (R. 201.)  The only other

document in the Administrative Record from Ms. Goldstein is a three page "Medical Assessment

of Ability to Do Work Related Activities (Mental)" dated October 20, 2019.  (R. 430–32.)

Plaintiff contends that there was an ongoing treatment relationship with Ms. Goldstein from

January of 2017 and the ALJ failed to take that long history of treatment into consideration.  (Pl.

Mem. 13, 20).  Plaintiff remarks in her Function Report dated October 29, 2018, that she

experiences panic attacks at least every month and talks to her therapist to deal with the attacks.

(R. 165.)  The Administrative Record indicates that Plaintiff has had an ongoing treatment

relationship with Ms. Goldstein, yet there are only four pages in the record — one page of

treatment notes, and a three-page medical assessment — that the ALJ used to determine that

Plaintiff did not have a psychiatric condition under the Regulations.  (R. 17.)

      With only four pages of information about Plaintiff's panic attacks and subsequent

treatment, there is not enough evidence in the Administrative Record to support any findings as

to Plaintiff's mental limitations.  The ALJ erred in not seeking additional evidence as there was

an obvious gap in the record.  *Eusepi*, 595 F. App'x. at 9; *Craig*, 218 F. Supp. 3d at 267.  The

"duty to develop the record . . . ensur[es] that the record as a whole is complete" so the ALJ can

effectively determine the RFC of a claimant.  *Sigmen*, 2015 WL 251768, at *11 (citing *Casino-

Ortiz*, 2007 WL 2745704, at *7.

      The ALJ did not attempt to obtain additional records or treatment notes from Ms.

Goldstein, or seek an evaluation from Dr. Lee, one of Plaintiff's treating physicians, who had

noted Plaintiff's panic attacks in his own treatment notes.  (R. 392-94.)  Courts within the

Second Circuit have remanded cases where the ALJ failed to make any attempts to obtain

missing treatment records that are important to the RFC determination from treating physicians

as well as social workers and mental health counselors who have a treating relationship with the

plaintiff.  *See Craig*, 218 F. Supp. 3d at 268 ("The absence of any treatment records from [the

treating physician], with no documented attempts by the ALJ to obtain them, is such a clear

violation of the ALJ's duty to develop the record…"); *Gardner v. Colvin*, No. 16-CV-2385, 2019

WL 3753797, at *17 (E.D.N.Y. Aug. 8, 2019) ("The lack of psychotherapy notes also implicates

the ALJ's decision to give [the social worker's] findings little weight.  Therefore, the ALJ should

have sought and reviewed these notes which may have impacted her determination regarding the

weight to be given to [the social worker's] findings." (footnote omitted)); *Cannizzaro v. Saul*,

No. 19-CV-690, 2020 WL 5628066, at *3–4 (W.D.N.Y. Sept. 21, 2020) ("The A.L.J.'s failure to

attempt to obtain [the mental health counselor's] treatment notes is cause for remand.").[3]  Even if

Plaintiff's counsel represented at the hearing that the record was complete or the ALJ holds the

record open for additional records, this does not discharge the ALJ's duty to develop the record.

*Cannizzaro,* 2020 WL 5628066, at *4 ("The A.L.J.'s duty to develop the record remained intact

even though Plaintiff's counsel indicated that the record was complete."); *see also Curtis v.

Astrue*, No. 11-CV-786, 2012 WL 6098258, at *5 (N.D.N.Y. Oct. 30, 2012), *report and

recommendation adopted*, 2012 WL 6098256 (N.D.N.Y. Dec. 7, 2012); *Newsome v. Astrue*, 817

F. Supp. 2d 111, 137 (E.D.N.Y. 2011); *Ayer v. Astrue,* No. 11-CV-83, 2012 WL 381784, at *6

(D. Vt. Feb. 6, 2012).[4]

---

[3] *Cf.*, *Michael K. v. Comm'r of Soc. Sec.*, No. 20-CV-1467, 2022 WL 3346930, at *6 (W.D.N.Y. Aug. 12, 2022) (finding that the ALJ did not have a duty to develop non-medical source records where there were only three pages missing out of a hundred total from the vocational counselor's report, and there were also additional medical sources for the ALJ to evaluate.)

[4] Prior to the abolition of the treating physician rule, "ALJ's were required to obtain an opinion from a claimant's treating physician" for the impairments a Plaintiff claimed as part of their duty to develop the record. *Russ v. Comm'r of Soc. Sec.*, 582 F. Supp. 3d 151, 163 (S.D.N.Y. Jan. 31, 2022). The courts would frequently remand cases where the ALJ failed to do so if the record did not contain sufficient evidence for the ALJ to effectively assess the residual functional capacity. *See, e.g., Hooper v. Colvin*, 199 F. Supp. 3d 796, 815 (S.D.N.Y. 2016) (remanding the case when the ALJ made a disability determination based on a record lacking a complete medical opinion.); *McKinley v. Comm'r, Soc. Sec. Admin.*, No. 17-CV-6439, 2018 WL 4328840, at *7–8 (S.D.N.Y. Sept. 11, 2018) (remanding the case when there were obvious gaps in the record and the ALJ failed to obtain an assessment of the plaintiff's functional limitations due to their mental health disorder); *cf. Tankisi*, 521 F. App'x at 34 (finding that remand was not necessary even though the ALJ did not seek a medical opinion from a treating physician because the medical records were extensive and sufficient to assess the plaintiff's RFC.)

In order for an ALJ to make a disability determination without a medical source opinion about the Plaintiff's functional limitations there must be "no obvious gaps in the administrative record" and the ALJ must "[possess] a complete medical history." *Rosa*, 168 F.3d at 79 n.5. There are obvious gaps in the record, as there is only one page of treatment notes and a three-page medical assessment form from Ms. Goldstein who treated Plaintiff from January 2017 through October 2019. The only other mention of Plaintiff's mental limitations was a notation from the treating physician Dr. Lee in March of 2017. (R. 392–94.) The record was not sufficient for the ALJ to assess Plaintiff's functional abilities due to her panic attacks. The ALJ made no attempts to obtain the missing records from Ms. Goldstein and in addition made no attempts to seek out an assessment from Dr. Lee or even request a consultative examination with a psychiatrist or psychologist with all of Ms. Goldstein's records.[5] *See Marcano v. Berryhill,* No. 16-CV-8033, 2018 WL 2316340, at *17 (S.D.N.Y. Apr. 30, 2018) ("If the information obtained from medical sources is insufficient to make a disability determination, or if the ALJ is unable to seek clarification from treating sources, the regulations also provide that the ALJ should ask the claimant to attend one or more consultative evaluations.").

In addition, the ALJ failed to ask Plaintiff any questions about her claim of a mental health impairment at the hearing. Part of the ALJ's duty to develop the record includes the duty to question a plaintiff adequately about their subjective complaints and the impact of their impairments on the functional capacity. *See Echevarria v. Sec'y of Health & Hum. Servs.*, 685 F.2d 751, 755–56 (2d Cir. 1982); *Brown v. Comm'r of Soc. Sec.*, 709 F. Supp. 2d 248, 256

---

[5] Dr. Kennedy-Walsh, a consultative examiner, reviewed Plaintiff's records on December 7, 2018 and found there was insufficient evidence to evaluate the claim. Dr. Kennedy-Walsh only had the one-page report from Ms. Goldstein to determine if there was a mental health impairment and determined this was not enough evidence to substantiate the presence of a disorder. (R. 62–63.)

(S.D.N.Y. 2010).  The ALJ did not ask Plaintiff any questions related to the impairments she claimed, including her physical impairments.  Remand is appropriate when the ALJ fails to sufficiently questions the Plaintiff about their subjective complaints.  *See Smith v. Berryhill*, No. 16-CV-6502, 2019 WL 3936736, at *11 (E.D.N.Y. Aug. 20, 2019) (remanding because "the ALJ did not adequately question the plaintiff about her subjective complaints"); *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 352 (E.D.N.Y. 2010) (remanding because, among other reasons, the ALJ "failed to question Plaintiff at the hearing about the nature of his activities or limitations").

   Remand is appropriate because of the gaps in the record, to obtain a mental health assessment from Plaintiff's treating physician or a consultative examiner, and for the ALJ to sufficiently question Plaintiff about her claimed limitations.

## III.  Conclusion

   For the foregoing reasons, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross motion for judgment on the pleadings. The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings consistent with this opinion, pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

Dated: September 30, 2022
       Brooklyn, New York

                                        SO ORDERED:


                                        ____s/ MKB_____
                                        MARGO K. BRODIE
                                        United States District Judge